[Civ. No. 22731. Second Dist., Div. One. Sept. 19, 1958.]

JOHN RIEGER et al., as Executors, etc., Respondents, v.
FRANK E. RICH et al., Appellants.

652

James C. Webb for Appellants.

Walker, Johnstone & Walker, Ball, Hunt & Hart and George A. Hart, Jr., for Respondents.

WHITE, P. J.—Plaintiffs, in their capacity as coexecutors of the estate of Maria Lamp, Deceased, instituted this action to set aside a certain deed executed July 11, 1955, by said decedent, as grantor, to defendants, the day preceding the grantor's death.

By their complaint plaintiffs alleged fraud, undue influence, lack of capacity, and that the deed was procured by defendants without the payment of any consideration.

By their answer, defendants denied generally the allegations of the complaint, and as a third affirmative defense alleged ownership in the property in question by reason of an administratrix' deed from the estate of Herman Lamp (husband of decedent), dated October 27, 1949.

At the conclusion of the trial and following submission of the cause on written briefs, the court made the following findings:

I.

That on May 1, 1950, Maria Lamp received an unconditional grant deed to real property located at 4422-4424 Vista

Avenue, Long Beach, California, and that from May 1, 1950 to date of her death, July 12, 1955, she was the sole owner in fee of said real property.

II.

That on July 11, 1955, Maria Lamp was without mental capacity to attend to her business affairs, to know the extent or value of the property owned by her, or to know the relationship of persons appearing before her, or to execute the deed of July 11, 1955.

III.

That a confidential relationship existed between defendants and Maria Lamp.

IV.

That defendants did exercise undue influence upon said Maria Lamp, and defendants did, in the exercise of said undue influence, procure said Maria Lamp to execute said grant deed without the payment of any consideration therefor.

V.

That Maria Lamp had no independent advice from any person in reference to the execution of said deed of July 11, 1955.

Judgment was accordingly entered that the deed of July 11, 1955, from Maria Lamp to defendants be cancelled, vacated and set aside as null and void, and of no force or effect. Defendants' motion for a new trial was denied. From the judgment and the order thereafter made, denying their motion for a new trial, defendants prosecute this appeal.

Concerning the factual background surrounding this litigation, the record reflects that the subject property consists of a duplex dwelling situated in the city of Long Beach. In September of 1941 defendants became resident tenants in one unit of the property, at that time owned by decedent Maria Lamp and her husband Herman Lamp, who occupied the other unit. The owners continued to reside on the property until their respective deaths, Herman Lamp until 1949 and decedent herein, Maria Lamp until July 12, 1955. Defendants also continuously lived on the property up to the time of trial of this action.

Following the death of Herman Lamp, his estate was probated in the Superior Court of Los Angeles County. In November, 1949, defendants received an administratrix' deed dated October 27, 1949, for the duplex property. The deed was executed by decedent Maria Lamp as administratrix of

the estate of her husband Herman Lamp. The deed reserved in the widow, Maria Lamp, a life estate. Defendants paid a consideration of $5,800 for the property, but the money therefor was received from the administratrix Maria Lamp, and defendants gave Maria Lamp no note, trust deed or any other evidence of said loan or advance, and had no agreement—oral or written—as to time of repayment of principal or any provision for payment of interest.

Subsequently, in April, 1950, defendants borrowed $4,800 for which, according to the testimony of defendant Frank E. Rich, he gave Maria Lamp an unsecured note for $6,000. That, in September, 1953, Maria Lamp, "marked it paid and handed it back to me." The note was not produced. Mr. Rich testified that the last time he saw it, was in the office of the attorneys for Maria Lamp. An additional $800 was borrowed by defendants from Maria Lamp shortly after May 1, 1950, and subsequently, a further sum of $1,200 was borrowed, making the total loans from decedent Maria Lamp to defendants, the sum of $11,400.

On May 1, 1950, defendants executed and delivered to Maria Lamp a grant deed to the duplex property here involved, which document remained in her safety deposit box until removed by defendant Frank E. Rich, about July 8, 1955.

With regard to the payment of taxes on the subject property after execution of the deed of May 1, 1950, defendant Frank E. Rich testified that while Maria Lamp sent in the check for the taxes he paid "my half of it." That such payments were made in cash, and no receipts were obtained therefor. In 1955, defendant Frank E. Rich was placed upon Maria Lamp's commercial checking account, with the right to withdraw money upon his signature only, and was also placed on the safety deposit box of Maria Lamp, with the right to enter said safety deposit box at the Farmers and Merchants Bank, 3rd and Pine Avenue, Long Beach, California, unaccompanied.

With regard to the foregoing transactions defendant Viola Rich testified she and her husband had known decedent Maria Lamp for approximately 12 years. That she and her husband acquired the foregoing administratrix' deed by way of purchase of the duplex property for $5,800 in October, 1949. Admitted that her husband had borrowed approximately $4,800 from deceased to make said purchase. That during the month of April, 1950, her husband received approximately $5,800 as an additional loan from deceased. That the grant

deed dated May 1, 1950, was executed and delivered by her and her husband to deceased, at the Farmers and Merchants Bank, 302 Pine Avenue, Long Beach, California, at which time no money or other consideration was received by the Riches in exchange for said grant deed, but was given by way of security to deceased for said sums totaling $5,800, previously borrowed by Mr. Rich from said deceased, and that shortly thereafter said deceased did lend an additional $800 to Mr. Rich. That arrangements for the execution and delivery of said note was made by conversations with deceased at her home a few days prior thereto. That the Riches made regular weekly payments thereafter to deceased on account of said loans. Said grant deed of May 1, 1950, was returned to Mr. Rich's possession about July 8, 1955, on which date decedent stated to this witness that she had instructed Mr. Rich to pick up this deed from her safety deposit box and that decedent wished the Riches to have it. That Mr. Rich had delivered his promissory note for $6,000 to said decedent shortly prior to May 1, 1950. That this witness and her husband visited decedent almost daily during the time she was at home between January 1, 1955, and July 7, 1955, during which period of time she performed numerous tasks for decedent, including the making of her clothes, shampooing her hair, and other personal services, also including business trips, depositing monies, etc., and that upon returning from such business trips she did hand to deceased the bank book and other receipts, at which times said deceased would check the receipts and the bank book. That this witness had also performed similar numerous tasks and made various business trips for said decedent from time to time almost daily for the last five years of decedent's life.

Defendant Frank E. Rich corroborated generally the foregoing testimony of his wife and also stated that he also had performed numerous personal services and attended to business matters for decedent pursuant to her instructions, for approximately five years immediately preceding her death, all without compensation. That in April, 1955, some three months prior to her death, decedent authorized him to sign checks on her bank account and to enter, unaccompanied, her safety deposit box at the bank. He further testified that decedent had stated in December, 1954, that she intended to reconvey title to the duplex property to the Riches shortly after the holidays. That about January, 1955, decedent told this witness that her brother and his wife were coming to visit her;

that she would like to have them live in the Riches' side of the duplex and look after her. That she intended to offer the duplex to her brother and his wife and she discussed arrangements with him regarding her selling one of her trust deeds to obtain monies necessary to buy out the Riches' equity in the said duplex. That deceased later requested a Mr. Prichard, her financial adviser, to sell one of her said trust deeds some time in February or March of 1955. That the expenses of the duplex property, including the taxes, were shared and paid jointly by the Riches and the deceased, and the use of said premises was also shared jointly by said parties. That he had repaid to decedent approximately $7,500 for the monies he had received from her. That he kept a memo or record of monies he had paid to deceased and she had kept her own similar records.

Mr. Rich also testified that at and during all times hereinbefore mentioned the decedent discussed fully and in detail all business matters and all other transactions wherein she made demand upon him for his assistance therein and that she fully understood all phases thereof. That he made a full accounting and report to her in each of such instances. That decedent carried on correspondence and other business matters and kept her own business records.

Decedent Maria Lamp had for some considerable time suffered from arteriosclerosis in both her lower extremities, frequently incapacitating her, during which times, according to defendants, they "took care of and looked after her" since decedent was living alone.

In January, 1955, decedent Maria Lamp, then 79 years of age, suffered an acute coronary occlusion for which she was hospitalized for four weeks. In March, 1955, she was again hospitalized for some three weeks following an attack of peripheral vascular disease, consisting of severe hardening of the arteries of the lower extremities.

On July 7, 1955, decedent Maria Lamp was hospitalized for the last time, and on July 8, was examined by Dr. G. D. Bock, an orthopedic surgeon, who diagnosed her ailment as arteriosclerotic gangrene, involving both lower extremities and most marked on the right leg. There is testimony that on July 8, 1955 decedent was in extreme pain. Dr. Bock recommended amputation of the right leg at mid-thigh level and that sympathetic blocks be carried out on the right side to cut down the progress of gangrene in the left limb. Dr. Bock testified that sympathetic block is quite similar to a spinal anaesthetic.

A long needle, approximately four or five inches in length, is used, and is inserted in just one side of the spine and pushed down along the bodies of the vertebral column itself. The sympathetic ganglia or nerves lie just to the front of the bodies of the vertebrae. Once the needle engages the site of the body of the vertebrae it is pushed a little farther and the area is infiltrated with novocain or some such drug. That produces a block of the sympathetic system,—nervous system. Such sympathetic nerve blocking was performed on the 8th, 9th, 10th, 11th, and 12th of July.

Maria Lamp's right leg was amputated at mid-thigh level July 9, 1955, which said operation was considered a severe shock to the nervous system of a woman 79 years of age.

Dr. Bock testified: "I would say surgery of this magnitude would represent quite a shock to the system."

The doctor further testified as follows: "I would say there was great pain; I would even use the term 'agonizing pain' at times."

On July 11, 1955, defendants Frank E. Rich and Viola P. Rich procured from Maria Lamp a grant deed to the real property located at 4422-4424 Vista Avenue, Long Beach, California. No consideration was received by Maria Lamp for the execution of said grant deed. At the time the grant deed was executed, the attending surgeon, Dr. Bock, was not advised.

Maria Lamp passed away July 12, 1955, the day following execution by her of the grant deed to defendants, and the validity of which instrument is the subject of this litigation.

With regard to the events occurring on July 7th when decedent was last removed to the hospital, and the succeeding days prior to decedent's death, defendant Mrs. Viola P. Rich testified that she talked with decedent at the latter's home on July 7. That on the following day, her husband, defendant Frank E. Rich, transported her to the hospital, stating that decedent desired to see the witness. That she did visit with decedent at the hospital on July 8, in the presence of her husband, the attending nurse, and Shirley Mae Smith the notary public. Decedent was very glad to see her and engaged in conversation with her, in which decedent told this witness that she was deeding the duplex property back to her and her husband; that Mr. Rich had picked up the grant deed of May 1, 1950, from her safety deposit box at decedent's request because she wanted the Riches to have it also. That decedent

discussed some minor changes to be made in her part of the duplex dwelling after she returned from the hospital, to facilitate her getting about in the wheelchair; that this witness and her husband signed an unrecorded grant deed dated July 8, 1955, as witnesses to decedent's signature thereto in the presence of said notary, Shirley Mae Smith. That said decedent put on her glasses and read the grant deed before signing it and then placed it upon a suitcase across her lap and affixed her signature thereto. Decedent remarked that her signature did not look very good. That decedent did fully discuss with her all business matters and transactions in which this witness assisted and participated. In this testimony Mrs. Rich was corroborated by her husband, defendant Frank E. Rich.

As to the mental capacity of decedent to execute the deed of July 11, 1955, the day before her death, and the validity of which is here challenged, the evidence was in sharp conflict. We deem it unnecessary to here set forth the evidence in detail. Suffice it to say Dr. Bock who performed the surgery was asked, "Taking into consideration the age of Maria Lamp; your examination of the 8th; your surgery on the 9th, where you amputated her right leg above the knee; your personal observation of her during the time she was in the hospital; the administration of nerve blocks and drugs, as indicated by the hospital records and your own records; in your opinion was Maria Lamp, on July 11, 1955, mentally competent to execute a grant deed?" To which question he answered, "No." On cross-examination the witness stated that the novocain or the nerve blocks did not affect decedent mentally in any way as he observed her. He further testified that decedent recognized him as her doctor and responded to questions propounded to her except during and immediately following the surgery. That he discussed fully with her the proposed operation and that she consented to undergo the same.

John Rieger testified he had known decedent some six years prior to her demise and visited her approximately once a week during that period. In the opinion of this witness, decedent was mentally incompetent, and had been for some seven months prior to her death.

A niece of decedent testified that the latter had been incompetent since January, 1955. That the decedent was mentally incompetent was also the opinion of a friend Mrs. William Marxen.

On the contrary, the notary public who took decedent's acknowledgment on the questioned deed testified that while decedent appeared to have some emotional distress, nothing occurred to indicate that the decedent was not mentally competent at the time she affixed her signature to the deed. Margaret Orr, an employee of the hospital who witnessed decedent's signature to the deed on July 11, 1955, testified that nothing occurred at that time to cause her to suspect that Maria Lamp was not mentally competent to understand what she was signing.

Sworn as a witness for defendants, Dr. J. Knutson testified that he had attended decedent continuously from January, 1955, until her death on July 12, 1955. That during this time there was no change in the mental condition of decedent nor was there any mental deterioration during that period. Substantially the same testimony was given by Dr. J. Reed, an associate of Dr. Knudson, Minnie Lee Payne testified she was in constant attendance upon decedent from June 11th to July 7th, 1955. That during this interval it was her opinion that decedent was mentally competent. Similar testimony was given by Mrs. Nora N. Lindenberger and Effie Pauls, a neighbor of the decedent.

We are satisfied that Finding I that on May 1, 1950, decedent Maria Lamp received from appellants an unconditional grant deed to the subject property, and from the date thereof until her death was the sole owner in fee of said real property finds ample support in the evidence. First, the instrument was unconditional on its face, and remained in the safety deposit box of decedent from the time of delivery until removed therefrom early in July, 1955 by appellant Frank E. Rich. The absence of any trust deed, mortgage or other writtten memorandum to the contrary, supports a reasonable inference that the deed was what it purported to be on its face. Furthermore, the actions of decedent Maria Lamp from May 1, 1950, to July 11, 1955, were at all times consistent with absolute fee ownership. It was her check that paid the taxes, although appellants testified that for a short period in 1949 and early in 1950, they paid a share of the taxes. There was testimony that on one occasion decedent had stated, ''The Riches owe me over six months back rent.'' Also, on another occasion appellant Mrs. Rich stated to her husband, ''You pay the rental on the wheelchair, as we have not paid the rent to Mrs. Lamp this month.'' Thereafter, in May, 1955, appellant Frank E. Rich delivered some money

to decedent, saying: "Here is part of the rent money." This conduct is not at all consistent with a claim of ownership of the property. There is also in evidence an exhibit purporting to be a statement of accounts between appellants and the decedent. On this document appears a notation in the handwriting of decedent wherein she allows appellant Frank E. Rich a credit of $300 "on a car loan" and that this allowance is made for a paint job done on the duplex. If appellants owned the duplex why would they be charging decedent for painting it? Appellant Frank E. Rich testified that decedent was going to give the property to her brother, if the brother would stay in California and take care of her, but because the brother could not stay, Maria Lamp would give it to appellants. Certainly, Maria Lamp must have considered that she owned the property in fee or she would not have considered giving it to her brother in consideration of his caring for her.

On their claim that the deed of May 1, 1950, absolute on its face, was in reality something essentially different, viz., a mortgage or a trust deed, the testimony must be clear, convincing and conclusive (*Goodfellow* v. *Goodfellow,* 219 Cal. 548, 554 [27 P.2d 898]; *Davis* v. *Stewart,* 31 Cal.App. 2d 574, 577 [88 P.2d 734]; *Stevens* v. *Fetterman,* 76 Cal. App. 741, 753 [246 P. 102]). Appellants' proof consisted for the most part on the oral declarations of the decedent made to appellant Frank E. Rich. It was for the trial court to determine what weight was to be accorded them (*Herbert* v. *Lankershim,* 9 Cal.2d 409, 430 [71 P.2d 220]). The conclusion of the trial court that the deed of May 1, 1950, from respondents to the decedent was an unconditional deed finds abundant support in the evidence and the inferences reasonably deducible therefrom.

Appellants next assail Finding II that on July 11, 1955 decedent Maria Lamp was without mental capacity to execute the deed bearing that date.

Appellants direct our attention to many cases involving the issues of undue influence which are undoubtedly correct, and in a proper case would doubtless be decisive. However, we are here concerned with a case involving the mental capacity of decedent Maria Lamp to execute the deed in question. The presence or absence of mental capacity is a matter which must necessarily depend upon the peculiar circumstances of the particular case rather than upon bare and academic rules. Manifestly, the trial court was best able to

appraise the weight of the testimony and the credibility of the witnesses, and came to the conclusion that on July 11, 1955, decedent was bereft of the mental capacity to know the extent or value of the property owned by her or to know and understand the nature of her act. In other words, that she was not fully cognizant of her actions with regard to her property at the time she affixed her signature to the deed.

 It is axiomatic that on appeal, the power of an appellate tribunal begins and ends with a determination of whether there is in the record substantial evidence, contradicted or uncontradicted, which supports the judgment rendered. And unless it is made clearly to appear that upon no hypothesis whatever is there sufficient substantial evidence to support the conclusion reached in the court below, that conclusion may not be set aside on the ground of insufficiency of the evidence. We must also assume in favor of the judgment the existence of every fact which the trier of facts could have reasonably deduced from the evidence.

 In the case at bar, if the circumstances reasonably justify the judgment of the duly constituted arbiter of the facts, the opinion of the reviewing court that these circumstances might also reasonably be reconciled with a contrary conclusion will not warrant interference with the determination of the trial court. Viewed in the light of these rules, we are persuaded that the finding of the trial court as to mental incapacity must be sustained.

There was evidence that decedent was 79 years of age. During the year 1955 she suffered a severe heart attack which necessitated her hospitalization on two different occasions. She was afflicted with a generalized arteriosclerotic condition, aggravated by advanced gangrene in both legs. During the year 1955, here in question, decedent up to the time of her death suffered extreme pain which required her to take daily doses of pain-killing drugs to alleviate such pain. On July 7, 1955, when decedent was admitted to the hospital the last time, her signature upon hospital records was barely legible. Further evidence of lack of coordination and inability to place scribblings near the signature line is shown on the document consenting to the nerve blocks. At that time appellant Frank E. Rich signed the consent on behalf of decedent.

The hospital records indicate that the spinal blocks were performed on July 8, 9, 10, 11 (date of signing the deed), and 12. As heretofore noted, this is a procedure which involves

the insertion of a needle 4 to 5 inches long into the lumbar spine of the patient.

On the hospital record designated "Laboratory Pathological Special Report," it is stated: "An extensive generalized arteriosclerosis involving all vessels examined, with marked reduction in visible lumens." Gould's Medical Dictionary defines "lumens" as "cavity of blood vessel."

Noteworthy also is the fact that the nurses' records contained in the hospital records revealed that the decedent Maria Lamp, *suffered excruciating pain throughout her entire stay in the hospital and that she received narcotics frequently to relieve pain and suffering*. The hospital charts indicate that the patient cried out, moaned and complained of pain. The record of July 8, 1955, 12 a.m., shows the following: "Patient seems confused; at times pecks at covers; pain in legs severe."

When the foregoing is added to the testimony of other witnesses for respondents, as narrated in the factual background hereinbefore set forth, we are satisfied that under applicable rules, the finding of the trial court as to mental incapacity cannot be strictured as being without substantial evidence in the record to support it, and as not sufficient to overcome any existing presumption of mental capacity.

■ Appellants next insist that "there is not one shred of evidence herein attesting to the existence of a confidential relationship between the decedent and appellants. They concede there was "friendship, affection and a close relationship," and that "it might be inferred that the deceased reposed confidence in the integrity of (appellant) Mrs. Rich," but that all this amounted to was "the behavior of a friend who serves another at his request. . . ." (*Hausfelder* v. *Security-First Nat. Bank*, 77 Cal.App.2d 478, 483 [176 P.2d 84]). It would unduly prolong this already lengthy opinion to here state the evidence as to the relationship existing between decedent and appellants. We have already done so. Suffice it to say that the evidence clearly establishes that decedent reposed trust and confidence in the integrity and fidelity of both appellants. These are the elements of a confidential or fiduciary relationship, which in law are synonymous (*Estate of Cover*, 188 Cal. 133, 143 [204 P. 583]).

■ Appellants next challenge the sufficiency of the evidence to support the finding of undue influence on their part to procure decedent Maria Lamp to execute the deed of July 11, 1955, without the payment of any consideration therefor. There can be no doubt that appellants actively participated in

the transaction that resulted in the signing of the deed of July 11, 1955, by decedent and equally unassailable is the statement that by such transaction appellants obtained a gift or advantage which enriched them. Since appellants occupied a confidential relationship toward decedent, the principle applicable to the issues of undue influence is thus stated in *Khoury* v. *Barham*, 85 Cal.App.2d 202, 212 [192 P.2d 823] :

"The rule is inflexible that no one who holds a confidential relation toward another shall take advantage of that relation in favor of himself, or deal with the other person upon terms of his own making; that in every such transaction between persons standing in that relation, the law will presume that he who held the influence over the other exercised it unduly to his own advantage."

And in *Herbert* v. *Lankershim*, 9 Cal.2d 409, 426 [71 P.2d 220], our Supreme Court stated:

"A concise statement of the rule where the relations between the parties were intimate and highly confidential, as here, and where the donor had no independent advice, and where the conveyance was without valuable consideration, or, it may be parenthetically added, in cases where the consideration is grossly inadequate, is announced as follows in *Mead* v. *Mead*, 41 Cal.App. 280 [182 P. 761] : 'Under such circumstances the decisions hold uniformly that the transaction resulting in benefit of the trustee should be viewed with the most scrutinizing jealousy, and that the presumption of fraud attaches and must be overcome by evidence that the deed is what it purports to be.' "

 Where, as here, appellants base their claim upon a deed obtained from one with whom they stood in a relation of trust and confidence, the usual rule that the burden of proof rests upon the person who asserts fraud is relaxed to the extent that the beneficiary of a transaction under such circumstances must bear the burden of proving that he exhibited that degree of good faith sufficient to remove all doubt respecting the fairness of the transaction (*Herbert* v. *Lankershim*, *supra*, p. 426).

 As to the court's finding that decedent had no independent advice with regard to the execution of the deed of July 11, 1955, appellants urge that a deed may not be set aside because of the absence of independent advice alone. Undoubtedly this is true, but the lack of independent advice assumes considerable importance unless it clearly appears that the deed was made freely, voluntarily, and with full under-

standing of all the facts and the effect of the document (*Wilbur* v. *Wilbur*, 197 Cal. 1, 16 [239 P. 332] ; *Mead* v. *Smith*, 106 Cal.App.2d 1, 5 [234 P.2d 705] ). ■ In view of the evidentiary features of the case at bar, the rule would seem to be, as stated in *Herbert* v. *Lankershim, supra,* p. 426: ". . . one who holds such confidential relation will be presumed to have taken undue advantage of the trusting friend *unless it shall appear that such person had independent advice* and acted not only of his own volition but with full comprehension of the results of his act." (Emphasis added.)

■ In the case now engaging our attention there is no evidence that decedent had the benefit of any independent advice, and under the facts and circumstances here present the court was justified in taking the absence of such advice into consideration in formulating its decision.

■ Appellants rest a claim of prejudicial error upon the action of the trial court in permitting respondents over objection, to file an amended complaint to conform to proof after the trial had been concluded. Conceding that the amended complaint raised issues not framed by the original pleadings, it did plead issues raised by the evidence and which were treated as such during the trial. ■ The granting or denial of permission to file amendments to pleadings to conform to proof rests largely in the discretion of the trial court. The reason therefor is obvious and is intended to insure, as far as possible, that substantial justice is done by a liberal construction of the rule. ■ When the amended complaint filed herein is compared with the evidence adduced at the trial, we are satisfied that there was no abuse of discretion on the part of the court in permitting it to be filed (39 Cal.Jur.2d, par. 258; *Baker* v. *Van Dolzer,* 142 Cal.App.2d 428, 437 [298 P.2d 86] ; *Farnsworth* v. *Hunter,* 11 Cal.2d 27, 31 [77 P.2d 840] ; *Carman* v. *Athearn,* 77 Cal.App.2d 585, 594 [175 P. 2d 926] ).

■ Appellants' claim that they were given no opportunity to plead or to demur is answered by the statement that since the issues tendered by the amended pleading to conform to the proof, have already been tried they are deemed denied without pleading (*Valencia* v. *Shell Oil Co.,* 23 Cal.2d 840, 848 [147 P.2d 558] ).

■ Appellants' contention that they were denied a fair and impartial trial, because they were denied an opportunity to orally argue the case at the conclusion of the trial is, in view of the record, unavailing. The reporter's transcript re-

veals that it was not appellants' counsel who sought to argue, but one of counsel for respondents who stated, "I want to argue just a little bit, if the court please," to which the trial judge replied, "No, we are not going to argue this. You are going to have to submit it. I have to submit this case gentlemen. I have a juvenile matter coming in at 1:30 and another case coming in at 1:45. You may object to the idea of submitting this on written briefs but it has taken some time to try this and it is a little bit complicated in some of its phases and I like that better. It gives me time to read the briefs in between conferences, and that is the only reason I wanted it." After further colloquy between court and counsel, the former said: "I want these briefs to cover your contentions with reference to what is shown and argue the evidence that applies to those points in whatever you claim, or everything that you claim, in full, in other words." We entertain no doubt that when the court declined to hear oral argument but granted counsel the privilege of filing briefs, there was no abuse of discretion (*Golden Gate Lbr. Co.* v. *Sahrbacher*, 105 Cal. 114, 118 [38 P. 635]). See also *Dam* v. *Bond*, 80 Cal.App. 342, 347 [251 P. 818]. In a cause tried before the court, sitting without a jury, no absolute right to argument exists was the holding in *Larson* v. *Blue & White Cab Co.*, 24 Cal.App.2d 576, 578 [75 P.2d 612].

 On their motion for a new trial, appellants filed an affidavit of their attorney wherein he reiterated the claim that appellants were denied a fair trial because the court refused to permit oral argument, a contention we have herein resolved against them. In the affidavit, complaint is also made that since appellants' closing brief in the trial court was filed February 28, 1957, and the court rendered its decision on March 25, 1957, appellants were denied a fair trial, ". . . in that said Trial Court could not do justice in determining a cause involving three and one-half days' testimony, and some sixteen witnesses having appeared and testified, without oral argument. It would be highly speculative to assume that the Trial Court could recall all of the evidence adduced during the trial, and numerous individual witnesses called and their manner of testifying, and to do complete justice in deciding the said within cause, more than two months after the conclusion of the adducement of said testimony." We find no merit in this contention. The trial judge had the benefit not only of the notes made by him during the

trial but of the briefs filed by counsel, wherein it must be assumed, in view of the request of the trial court that the briefs, "cover your contentions with reference to what is shown and argue the evidence that applies to those points . . . in full, in other words," that the briefs contained an epitome of the evidence and the law applicable thereto. Certainly, it cannot justly be said that having the case under submission for less than a month would indicate such a lapse of time as would render it probable that the particular case and the evidence and issues therein could not have remained within the memory of the court, aided as it was by trial notes and briefs.

Counsel's affidavit on the motion for a new trial also sets forth that subsequent to the trial affiant discovered the original promissory note that was referred to in the trial and a copy of which we have herein held was properly admitted into evidence. It is contended that the original of said note tends "to strengthen the defendants' (appellants') cause herein, and to show as an instrument in writing, consideration for those certain monies advanced to defendants by the deceased, Maria Lamp, during the month of April, 1950, all to the further proof that the grant deed of the defendants herein to said deceased, bearing date of May 1, 1950, was in truth and fact given as security for the repayment of said monies." We fail to perceive wherein the original note can be regarded as of evidentiary value except insofar as it tends to corroborate the testimony given at the trial by appellant Frank E. Rich. Such testimony does not in any way affect the testimony concerning the ultimate issue involved in this litigation, viz., the mental competency of decedent Maria Lamp, when she signed the grant deed dated July 11, 1955.

We have concluded that there is substantial evidence in the record to support the findings, the latter support the judgment, and no prejudicial errors appear in the rulings of the court.

The attempted appeal from the order denying a new trial is dismissed. The judgment is affirmed.

Fourt, J., and Lillie, J., concurred.

Appellants' petition for a hearing by the Supreme Court was denied November 12, 1958.